**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-25-00604-001-TUC-JGZ (LCK) |
| Plaintiff, | **REPORT AND RECOMMENDATION** |
| v. | |
| Roy Lee Cherry, Jr., | |
| Defendant. | |

Before the Court is Defendant Roy Lee Cherry Jr.'s Motion to Suppress. (Doc. 53.) Under Local Rule of Criminal Procedure 57.6, this matter was referred to a Magistrate Judge for an evidentiary hearing and a report and recommendation. (Doc. 52 at 1; Doc. 69.) Upon review of the parties' briefs and testimony from the evidentiary hearing, the Magistrate Judge recommends that the District Judge, after her independent review, deny Defendant's motion and allow this case to proceed to trial.

## BACKGROUND[1]

On January 11, 2023, special agents with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) were conducting an undercover investigation at John's Guns &

---

[1] Except for the last paragraph, information in the Background section is taken from Agent Manoogian's Affidavit in Support of a Search Warrant, which was part of the Application for Search Warrant admitted as Exhibit 1 at the evidentiary hearing (*see* Doc. 61). *See United States v. Anderson*, 453 F.2d 174, 175 (9th Cir. 1971) ("[A]ll data necessary to show probable cause for the issuance of a search warrant must be contained within the four corners of a written affidavit given under oath.").

Ammo in Tucson, Arizona. (Ex. 1, Affidavit ¶ 13.) While waiting for a suspect's arrival, agents became aware of a gun purchaser who made suspicious comments while completing registration paperwork. (*Id*.) Based on the purchaser's comments, agents suspected the purchaser was a straw buyer (SB1) and initiated an investigation. (*Id*. ¶¶ 14-15.)

On or around April 17, 2023, further investigation into SB1 led agents to inspect the registration forms of other gun purchasers at John's Guns & Ammo. (*Id*. ¶ 19.) Upon inspection of the forms, agents identified two potential straw purchases by a separate straw buyer (SB2). (*Id*.) SB2 made individual gun purchases on March 16 and March 21, 2023. (*Id*. ¶¶ 20, 22.)

On April 19, 2023, agents were able to track down SB2's mobile phone number. (*Id*. ¶ 25.) Close to that time, agents also learned that SB2 had purchased both March 2023 firearms for a man named "Roy," who went by the alias "Memphis." (*Id*. ¶ 26.) SB2 described Memphis as a short, black male with a short fade haircut, who had good teeth, drove a white Mercedes Benz, and lived in the Tucson Foothills. (*Id*. ¶ 27.) SB2 told agents that Memphis was present when she made one of her March 2023 gun purchases and that he took possession of the firearm and put it in his car. (*Id*.) SB2 said that Memphis's phone number started with a 619 or 614 area code. (*Id*.) After interviewing SB2, agents returned to John's Guns & Ammo, where they questioned the owner about SB2's story. (*Id*. ¶ 28.) The owner confirmed that a black male of shorter stature with a fade type haircut came into his store shortly before SB2 arrived, and he gave the owner money for the firearm that SB2 ultimately would purchase. (*Id*.)

On April 20, 2023, agents obtained call records for SB2's mobile phone number (*id*. ¶ 29) and, one day later, the gun shop owner gave them a photograph from his shop's March 21, 2023, surveillance footage (*id*. ¶ 31). The surveillance footage was time stamped 3:40 p.m. and depicted an unidentified black male entering the store. (*Id*.) The footage also captured the man's white BMW sedan. (*Id*.) Based on the time stamp, agents cross-referenced the call records from SB2's mobile phone. (*Id*. ¶¶ 32-33.) The agents identified seven contacts between SB2 and a 615 phone number between 3:55 p.m. and 4:23 p.m. on

March 21, 2023. (*Id.* ¶ 33.) The records documented forty-three additional contacts between SB2 and the 615 number between March 10, 2023, and April 12, 2023. (*Id.* ¶ 36.)

Between April 21, 2023, and April 24, 2023, agents tracked the 615 phone number to Defendant Roy Lee Cherry Jr. (*Id.* ¶ 38.) They ultimately learned that Defendant's mother was the registered owner of a white 2016 BMW sedan, with an Arizona license plate of FSA1GG. (*Id.* ¶ 41.) On April 27, 2023, agents received law enforcement database photographs of a white BMW, with Arizona license plate number FSA1GG, which had a similar exterior appearance to the white BMW sedan depicted in the March 21, 2023, surveillance footage from John's Guns & Ammo. (*Id.* ¶ 47.) Agents also learned that Defendant had more than one criminal conviction (*id.* ¶ 44); he was on felony probation, which had been transferred from Tennessee to Pima County (*id.* ¶ 45); and SB1 also had extensive phone contact with Defendant (*id.* ¶ 46).

On June 2, 2023, ATF Agent Matthew Manoogian applied for a warrant to search the white BMW driven by Defendant (Ex. 1); and, on June 5, 2023, the warrant was executed (Doc. 53 at 4). Upon search of the vehicle, agents seized a semi-automatic pistol, one magazine, thirteen rounds of ammunition, clear baggies with suspected narcotics and marijuana, and a digital scale, among other items. (*Id.*) The search warrant is at the heart of the motion at hand.

**FACTUAL FINDINGS**[2]

On March 25, 2026, Magistrate Judge Bruce G. Macdonald held an evidentiary hearing on Defendant's Motion to Suppress.[3] (Doc. 59.) Agent Manoogian testified on the government's behalf. (Doc. 66.) No other witnesses testified. (*See id.*)

---

[2] Evidence presented at a suppression hearing is viewed in the light most favorable to the government. *United States v. Sherman*, 430 F.2d 1402, 1404 (9th Cir. 1970).

[3] After the evidentiary hearing, the referral of this criminal case was reassigned to Magistrate Judge Lynnette C. Kimmins, due to the impending retirement of Magistrate Judge Macdonald. (Docs. 68, 69.)

Agent Manoogian has been employed as an ATF field agent since September 2010. (Tr. at 9:3-4.[4]) Prior to entering the field in Tucson, Arizona, he underwent six months of training in Brunswick, Georgia. (*Id*. at 9:17-18.) His subsequent on-the-job training in Tucson covered investigations, firearms trafficking, narcotics, National Firearms Act violations, and prohibited possessor cases. (*Id*. at 10:12-14.) Agent Manoogian has also participated in training on search warrants. (*Id*. at 15:1-3.)

During search warrant training, Agent Manoogian learned how to draft the body of a warrant, how to articulate the probable cause statement, and how to support an affidavit with statements about his training and experience. (*Id*. at 15:7-14.) He is currently part of the Operation Southbound Firearms Trafficking Task Force, which focuses on interstate and international firearms trafficking, including the criminal possession and use of firearms. (*Id*. at 11:6-9.) Agent Manoogian has been involved in more than 50 investigations involving prohibited gun possessors. (*Id*. at 14:23-24.) He estimates that he has applied for approximately 75 to 80 federal search warrants. (*Id*. at 15:17-22.)

Agent Manoogian prepared the search warrant at issue in this case. (*Id*. at 16:24-17:1.) At the hearing, he reiterated several statements that he included in the search warrant based on his training and experience. He stated that prohibited possessors tend to retain their firearms for an extended period. (*Id*. at 20:3-5; Ex. 1, Affidavit ¶ 9.) Agent Manoogian testified that, in his sixteen years of service, he has seen prohibited possessors keep firearms in vehicles registered to other people, sometimes in the names of friends and family. (Tr. at 21:1-3; Ex. 1, Affidavit ¶¶ 11, 12.) In his experience, a straw purchaser is someone who acquires firearms for or on behalf of another person. (Tr. at 21:18-21; Ex. 1, Affidavit ¶ 8.) Agent Manoogian stated that prohibited possessors usually communicate with straw purchasers via cell phone (Tr. at 22:11-14; Ex. 1, Affidavit ¶ 10).

On cross-examination, Agent Manoogian testified that he did not witness Defendant engaged in a continuing pattern of illegal firearms activity. (Tr. at 49:4-20). Also, Agent Manoogian spent time after April 19, 2023, trying to locate the owner of the suspect

---

[4] "Tr." refers to the official suppression hearing transcript. (*See* Doc. 66.)

vehicle. (*Id.* at 48:2-5.) Agent Manoogian's search warrant application was admitted into evidence without objection after his direct examination. (*Id*. at 40:6-11; Doc. 61.)

## PROCEDURAL HISTORY

On January 29, 2025, Defendant Roy Lee Cherry Jr. was indicted by a grand jury on two felony counts of aiding and abetting in making false statements in connection with the acquisition of firearms, in violation of 18 U.S.C. §§ 2, 922(a)(6), 924(a)(2); one felony count of possession of a firearm and ammunition by a prohibited possessor, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8); and one felony count of possession with intent to distribute fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). (Doc. 1.) On January 29, 2026, Defendant filed a Motion to Suppress (Doc. 53), to which the government filed a response (Doc. 57). On March 25, 2026, the Court held an evidentiary hearing and heard oral argument on the motion. (Doc. 59.) On April 2, 2026, Defendant filed a Supplemental Briefing to Defendant's Motion to Suppress (Doc. 64); and, on April 3, 2026, the government filed a Supplemental Response to Defendant's Motion to Suppress (Doc. 65). On April 6, 2026, an official suppression hearing transcript was filed on the case docket. (Doc. 66.)

## LEGAL STANDARD

The Fourth Amendment requires that search warrants be supported by probable cause to be valid. *United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006). In determining whether probable cause exists, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit … there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). A fair probability does not amount to "certainty or even a preponderance of the evidence," and a reviewing court must not "flyspeck" the warrant affidavit through de novo review. *Gourde*, 440 F.3d at 1069. The duty of the reviewing court is simply to "ensure that the magistrate had a substantial basis for concluding that probable cause existed." *Gates*, 462 U.S. at 238-39 (cleaned up). A magistrate judge's probable cause determination is accorded "great

deference," *id.* at 236, and suppression is an appropriate remedy only "when a warrant is based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," *United States v. Grant*, 682 F.3d 827, 836 (9th Cir. 2012) (internal quotation marks and citation omitted). "The burden is on a defendant who seeks to suppress evidence obtained under a regularly issued search warrant to show the want of probable cause." *Chin Kay v. United States*, 311 F.2d 317, 321 (9th Cir. 1962).

## DISCUSSION

Defendant argues that the search warrant was invalid because the information upon which the Government relied to establish probable cause was stale at the time of the warrant application. (Doc. 53 at 5-9.) The Court disagrees.

"The passage of time is not necessarily a controlling factor in determining the existence of probable cause." *United States v. Foster*, 711 F.2d 871, 878 (9th Cir. 1983). A search warrant is not stale where "there is sufficient basis to believe, based on a continuing pattern or other good reasons, that the items to be seized are still on the premises." *United States v. Gann*, 732 F.2d 714, 722 (9th Cir. 1984). "Staleness must be evaluated in light of the particular facts of the case and the nature of the criminal activity and property sought." *United States v. Greany*, 929 F.2d 523, 525 (9th Cir. 1991). "One may properly infer that equipment acquired to accomplish the crime and records of the criminal activity will be kept for some period of time." *Id.*

### A.    Probable Cause Established

The information contained in Agent Manoogian's affidavit is sufficient to establish a fair probability that contraband would be found in the BMW at the time the warrant was issued. The affidavit established that ATF agents conducted an ongoing investigation that did not result in sufficient information to support a warrant application until late April 2023, and Agent Manoogian filed an application approximately five weeks later. (Tr. at 48; Ex. 1.) While the application relied on information that Defendant placed a firearm in the BMW on March 21, 2023 (Ex. 1, Affidavit ¶¶ 27, 31), when viewed within the totality

of the circumstances, the affidavit is more than sufficient to establish a fair probability that a firearm would be found in the car in early June 2023.

The affidavit explains that ATF agents discovered two suspected firearm buyers at a local gun shop (*id.* ¶¶ 14-15, 19); one of the suspects admitted she purchased firearms for a man named Roy, who went by the alias "Memphis" (*id.* ¶ 26); Memphis accompanied the suspect on one of the days she purchased a gun for him (*id.* ¶ 27); the gun shop owner verified the suspect's story (*id.* ¶ 28); the owner sent a photograph of video surveillance footage depicting Memphis's visit to the gun store (*id.* ¶ 31); the photograph included a clear image of Memphis's car (*id.* ¶¶ 31-32); phone records from the suspect's mobile phone indicated frequent contact with a 615 area code the day of the surveillance footage (*id.* ¶¶ 32-33); it was discovered that Roy Cherry was the owner of the phone number with the 615 area code and a white 2016 BMW with Arizona license plates was registered to his mother (*id.* ¶¶ 38, 41); his mother's BMW closely resembled the one depicted in surveillance footage (*id.* ¶¶ 31, 47); and the sedan, including license plate number, was listed in the search warrant affidavit and application (*id.* ¶ 41; Ex. 1, Attach. A).

Agent Manoogian's affidavit also includes statements concerning his training and experience as a seasoned ATF field agent (Ex. 1, Affidavit ¶¶ 1-4, 7-12); his experience with prohibited possessors (*id.* ¶ 3); his professional opinion that prohibited possessors use straw purchasers to acquire firearms on their behalf (*id.* ¶ 8); and his opinion that prohibited possessors tend to retain their firearms for long periods of time (*id.* ¶ 9).[5] Additionally, Agent Manoogian's affidavit contains information from which a reasonable inference can be drawn that the car would contain one or more firearms, as the affidavit indicates *both* suspect straw buyers had extensive contact with Defendant at his mobile number. (*Id.* ¶¶ 33-36, 46.) This information, when viewed holistically, is more than sufficient to establish a fair probability that the BMW contained a firearm in June 2023.

---

[5] A magistrate judge may depend on an ATF agent's professional experience and perspective in a probable cause determination. *See United States v. Parks*, 285 F.3d 1133, 1142 (9th Cir. 2002) (cleaned up) ("In making its determination, the court issuing the warrant is entitled to rely on the training and experience of police officers.").

### B.    Counterarguments Unavailing

Defendant's arguments in opposition to the probable cause determination are unavailing. Defendant asserts that the 73-day gap between March 21, 2023, when he was seen placing a gun in his car, and the June 2, 2023, search warrant application was too long for the information in the affidavit to be actionable. (Doc. 53 at 5.) He provides analogies to the timeliness inquiry in *United States v. Grant*, 682 F.3d 827 (9th Cir. 2012), and urges the Court to arrive at the same conclusion. (Doc. 53 at 6.) Defendant then insinuates it is the Government's burden to demonstrate that the information in the affidavit "details a pattern of similar conduct" to be valid and that the Government fails to do so. (*Id.* at 7.) Defendant next asserts that affidavit information is less likely to become stale if the evidence at issue cannot be disposed of easily (*id.*); and finally argues that a good faith exception to the exclusionary rule should not apply if there was insufficient probable cause to issue the warrant in question (*id.* at 9). These arguments fail for several reasons.

First, Defendant's staleness argument has little impact as to whether, given all the circumstances set forth in the affidavit, there was a fair probability that a firearm would be found in the car. The argument is myopic in that it ignores the "great deference" a reviewing court accords to a magistrate's probable cause determination and focuses only on a limited time lapse between the warrant application date and the alleged date of contraband possession. Both the Supreme Court and Ninth Circuit have counseled against this approach. *See Gates*, 462 U.S. at 236 (cleaned up) ("[C]ourts should not invalidate warrants by interpreting affidavits in a hypertechnical, rather than a commonsense, manner"); *Foster*, 711 F.2d at 878 ("The passage of time is not necessarily a controlling factor in determining the existence of probable cause.").

Second, the facts presented in *United States v. Grant* are inapposite to the case at hand, which requires its own analysis. In *Grant*, the Ninth Circuit ruled that an August 2009 search warrant was unsupported by probable cause where the affidavit failed to establish a "fair probability" that the gun from a January 2009 homicide would be found in the defendant's home nearly nine months after the murder. 682 F.3d at 835. The court

formed its conclusion based on a set of attenuated circumstances tying the defendant to the murder weapon, *see id.* at 828-32, and observed that the affidavit provided "no evidence suggesting that [the defendant] was involved" in the homicide, *id.* at 832. Notably, the defendant's connection to the alleged perpetrator(s) was based on a string of inferences too long to summarize here. *See id.* at 829-32. There are no such circumstances in the case at hand. Defendant was implicated directly by a suspect straw buyer who relayed accurate information about the circumstances surrounding his alleged illegal firearm possession, the information was corroborated and verified, and a search warrant was issued.

Third, assuming arguendo that the Ninth Circuit's "test for judging the timeliness of a search warrant is whether there is sufficient basis to believe, based upon a continuing pattern of conduct or other good reasons, that the items to be seized are still on the premises," *United States v. Collins*, 559 F.2d 561, 564 (9th Cir. 1977) (citing *Sgro v. United States*, 287 U.S. 206, 207 (1932)), is controlling, there are "other good reasons" to believe a gun would be found in the vehicle in June 2023. Those good reasons form the basis of Agent Manoogian's affidavit and include the fact that Defendant was contacted by *two* separate straw purchasers in the short time span of the ATF's investigation. That fact, viewed in a totality of the circumstances, provides a sufficient basis to believe that one or more firearms would be in the car two months after he was seen possessing a firearm. *See United States v. Hay*, 231 F.3d 630, 636 (9th Cir. 2000) (instructing that the magistrate judge could authorize a search so long as there were "good reasons" to believe 19 pornographic images were still in the defendant's computer); *cf. United States v. Angulo-Lopez*, 791 F.2d 1394, 1399 (9th Cir. 1986) ("Direct evidence that contraband or evidence is at a particular location is not essential to establish probable cause to search the location.").

Fourth, even if the search warrant was not supported by probable cause, the good faith exception to the exclusionary rule would apply because agents relied on the warrant in an objectively reasonable manner to search the BMW and the affidavit established "at least a colorable argument for probable cause for the exception to apply." *United States v.*

*Crews*, 502 F.3d 1130, 1136 (9th Cir. 2007) (cleaned up). Because there is a colorable argument that the search of the car was supported by probable cause, the agents' reliance on the search warrant was objectively reasonable.

Defendant fails to carry his burden of demonstrating the absence of probable cause to issue the search warrant, and his motion to suppress should be denied.

**RECOMMENDATION**

For the foregoing reasons, the Magistrate Judge recommends that the District Judge, after her independent review, deny Defendant's Motion to Suppress Evidence (Doc. 53). Pursuant to Federal Rule of Criminal Procedure 59(b)(2), any party may serve and file written objections within 14 days of being served a copy of this Report and Recommendation. A party may respond to the other party's objections within 14 days. LRCiv 7.2(c). No reply shall be filed unless leave is granted by the District Judge. If objections are not timely filed, they may be deemed waived.

Dated this 26th day of May, 2026.

Honorable Lynnette C. Kimmins
United States Magistrate Judge

- 10 -