**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

United States of America,

Plaintiff,

v.

Roy Lee Cherry, Jr.,

Defendant.

No. CR-25-00604-001-TUC-JGZ (LCK)

**ORDER**

Pending before the Court is Defendant Roy Lee Cherry's motion to suppress all evidence seized from the government's search of a white 2016 BMW 535. (Doc. 53.) United States Magistrate Judge Bruce Macdonald held an evidentiary hearing on the motion but retired before issuing a ruling. The case was reassigned to United States Magistrate Judge Lynnette C. Kimmins who reviewed the transcript of the evidentiary hearing and issued a Report and Recommendation ("R&R") (Doc. 72), recommending that the Court deny the motion to suppress. Magistrate Judge Kimmins concluded the information contained in the search warrant affidavit was sufficient to establish probable cause to search the vehicle.

Cherry timely filed an Objection to the R&R and Requested a De Novo Evidentiary Hearing. (Doc. 76.) The Government filed a response to the Objection. (Doc. 79.) After an independent review of the record, the Court will overrule Cherry's Objection and deny Cherry's Motion to Suppress and Request for De Novo Evidentiary Hearing.

## I. LEGAL STANDARDS

### A. Review of Report and Recommendation

When reviewing a magistrate judge's R&R, this Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). "[T]he district judge must review the magistrate judge's findings and recommendations de novo *if objection is made*, but not otherwise." *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc) (emphasis in original). District courts are not required to conduct "any review at all . . . of any issue that is not the subject of an objection." *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *see also* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Given the extent of Cherry's objections, the Court conducts a de novo review of Magistrate Judge Kimmins's R&R and directly considers Cherry's Motion to Suppress.

### B. Finding of Probable Cause

The Fourth Amendment requires that warrants be based upon probable cause. U.S. CONST. amend. IV. "Probable cause exists when, under the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Steinman*, 159 F.4th 550, 568 (9th Cir. 2025) (quoting *United States v. Rodgers*, 656 F.3d 1023, 1028 (9th Cir. 2011)). "[A]ll data necessary to show probable cause for the issuance of a search warrant must be contained within the four corners of a written affidavit given under oath." *United States v. Gourde*, 440 F.3d 1065, 1067 (9th Cir. 2006) (en banc) (quoting *United States v. Anderson*, 453 F.2d 174, 175 (9th Cir. 1971)).

## II. BACKGROUND

### A. Factual Statements in the Affidavit

On June 2, 2023, ATF Agent Manoogian submitted a sworn affidavit in support of an application for a warrant to search a white 2016 BMW 535 four-door sedan with Arizona license plate FSA1GG, in relation to the offenses of making false statements in connection with the acquisition of a firearm, 18 U.S.C. § 922(a)(6), and prohibited possession of a

firearm by a felon, 18 U.S.C. § 922(g)(1). (*Id.* ¶¶ 5, 6.) (Case No. 23-MB-04428-TUC-MSA, Doc. 2-1 ("Manoogian Aff.").) The facts Agent Manoogian set forth in his affidavit came from his "personal observations, training, experience, and information obtained from other Special Agents and sources." (*Id.* ¶ 4.) Agent Manoogian's experience includes a sixteen-year tenure with ATF. (*Id.* ¶ 1.)

On January 11, 2023, an ATF Confidential Informant heard a woman, later identified as Paula Bojorquez, make several suspicious statements while purchasing a firearm at John's Guns & Ammo, a Federal Firearms Licensee ("FFL") in Tucson, Arizona. (*Id.* ¶ 13.) Those statements alerted ATF Special Agents to what appeared to be a straw purchase and prompted ATF to initiate an investigation. (*Id.* ¶¶ 14–15.)

In pursuance of their investigation, ATF Agents Manoogian and Alex Tisch reviewed the FFL's recent transactions, and Agent Manoogian noticed two purchases by Alexandria Pierson, on March 16, 2023, and March 21, 2023, that appeared to be straw purchases. (*Id.* ¶¶ 19–23.) On April 19, 2023, the agents went to Pierson's address to speak with her, and while Pierson initially lied to the agents and said that the firearms had been stolen from her car, she later admitted that she purchased the firearms for a man named "Roy," who she later referred to as "Memphis." (*Id.* ¶¶ 24–26.) Pierson said Memphis "was a short black male with a short fade haircut," had "good teeth," "drove a white Mercedes Benz," "lived in the Foothills section of Tucson," and she believed his phone number started with a 619 or 614 area code. (*Id.* ¶ 27.) She told agents that Memphis went to John's Guns & Ammo to pay for one firearm, that she completed the ATF Form 4473 for the purchase, and that Memphis then took the firearm and put it in his car. (*Id.*)

Agents Manoogian and Tisch went to John's Guns & Ammo immediately after speaking with Pierson, where they spoke with the owner, John Petrush, who corroborated Pierson's story. (*Id.* ¶ 28.) Specifically, Petrush stated that "a black male of shorter stature, with a fade type haircut, came in the store shortly before Pierson," that he drove a white sedan, and that he supplied the money for the firearm Pierson purchased. (*Id.*) On April 21, 2023, Petrush also supplied Agent Manoogian with a photograph from his store's

surveillance footage depicting the unidentified male at John's Guns & Ammo on March 21, 2023, along with his vehicle, a white BMW sedan. (*Id.* ¶ 31.)

The call detail records for the phone associated with Pierson showed a series of seven texts with a 615 phone number around the time that surveillance footage was taken on March 21, 2023. (*Id.* ¶¶ 29–35.) In total, from March 10, 2023, to April 12, 2023, there were forty-three contacts between Pierson's phone and the 615 phone number. (*Id.* ¶ 36.) Agent Manoogian then performed a search in the TLO database, "a comprehensive online database of public and proprietary records," which returned the 615 number to Cherry. (*Id.* ¶¶ 37–38.) The area code 615 covers a portion of Tennessee. (*Id.* ¶ 33.) Additionally, Agent Tisch discovered that Bojorquez's phone called Cherry's phone number twenty-six times on April 17, 2023, the day ATF interviewed her. (*Id.* ¶ 46.) According to Agent Manoogian, "[p]rohibited possessors of firearms utilize cell phones to conduct and insulate their illicit activities, and to coordinate straw purchases of firearms." (*Id.* ¶ 10.)

Agent Manoogian also discovered that Cherry had two current Tucson addresses, one of which, on the road North Calle Sin Nombre, is in the Foothills section of Tucson. (*Id.* ¶ 38.) Tara Cherry, who Agents learned was a relative of Cherry, had active utility service at the North Calle Sin Nombre address. (*Id.* ¶¶ 39–40.) Further investigation revealed that Tara Cherry was the registered owner of a white BMW sedan with Arizona license plate number FSA1GG, which had similar features to the vehicle shown in the John's Guns & Ammo surveillance footage. (*Id.* ¶¶ 41, 47.) Based on Agent Manoogian's training and experience, prohibited possessors sometimes keep their firearms inside vehicles registered to other people to deny ownership and possession of the firearm if stopped by law enforcement. (*Id.* ¶ 12.)

Agents further learned that Cherry had a Tennessee driver's license which listed him as a Black male, 5' 4" tall, and 135 pounds. (*Id.* ¶ 43.) Additionally, Agents discovered that Cherry is a convicted felon and is thereby prohibited from possessing firearms and ammunition. (*Id.* ¶ 44.) According to Agent Manoogian, prohibited possessors utilize straw purchasers to purchase firearms for them from FFLs and "tend to retain their firearms for

long periods of time, since they cannot easily acquire firearms from federally licensed dealers, where a criminal background check is required to obtain a firearm." (*Id.* ¶¶ 8–9.) The agents' investigation continued until at least May 5, 2023. (*Id.* ¶ 48.)

The search warrant was approved and executed on June 5, 2023. Officers found in the BMW a semi-automatic pistol, a magazine, ammunition, baggies containing suspected narcotics and marijuana, a digital scale, and a bag of miscellaneous small baggies. (Doc. 53 at 4.)

B. Consideration of Probable Cause

In his Motion to Suppress, Cherry argues that the information supporting probable cause was stale—and therefore the search warrant was invalid—because: (1) the information was obtained approximately two-and-a-half months before the Government applied for a search warrant; (2) the Government failed to establish "a pattern of similar conduct" by Cherry; and (3) the evidence was easily disposable. (Doc. 53 at 4–9.) Cherry cites *United States v. Grant*, 682 F.3d 827, 832 (9th Cir. 2012) in support of his arguments. (*Id.*)

In ruling on the Motion to Suppress, Magistrate Judge Kimmins found that the information contained in the affidavit was sufficient to establish probable cause. (Doc. 72 at 6.) She determined that, when viewed in totality of the circumstances, the information in the affidavit established a fair probability that the BMW would contain a firearm in June 2023. (*Id*. at 7.) Magistrate Judge Kimmins found Cherry's counterarguments to the finding of probable cause unavailing. (*Id*. at 8–10.) Magistrate Judge Kimmins concluded: (1) Cherry's staleness argument does not sufficiently impact whether there was a fair probability that a firearm would be found in the vehicle; (2) Cherry's reliance on *United States v. Grant* is misplaced; (3) it is not necessary for the Government to demonstrate that the information in the affidavit "details a pattern of similar conduct"; and (4) even if the search warrant was not supported by probable cause, the good faith exception to the exclusionary rule applies since agents relied on the warrant in an objectively reasonable manner and the affidavit established "at least a colorable argument for probable cause for

the exception to apply." (Doc. 72 at 8–10 (citations omitted).) The Court agrees with Magistrate Judge Kimmins's conclusions.

## III. DEFENDANT'S OBJECTIONS

Cherry advances five arguments in his Objection to the R&R: (1) Magistrate Judge Kimmins erred in her factual findings and acceptance of Agent Manoogian's testimony because she did not personally observe his live testimony or indicate that she based her findings on Magistrate Judge Macdonald's personal observations, (Doc. 76 at 3–6); (2) Magistrate Judge Kimmins erred in applying the standard "that evidence taken at a suppression hearing is to be viewed 'most favorably to the position of the government,'" (*id.* at 6–8); (3) Magistrate Judge Kimmins erroneously accepted Agent Manoogian's testimony regarding the general habits of prohibited possessors, (*id.* at 8–9); (4) Magistrate Judge Kimmins incorrectly found probable cause and concluded the information in the affidavit was not stale, (*id.* at 9–11); and (5) Magistrate Judge Kimmins erred in relying on *United States v. Crews*, 502 F.3d 1130 (9th Cir. 2007), and in finding that the good faith exception applies, (*id.* at 11–12).

### A. Live Testimony and Request for De Novo Hearing

Cherry's first three objections are easily resolved. Cherry's motion to suppress did not entitle him to an evidentiary hearing. In this case, the determination of whether the warrant is supported by probable cause is assessed exclusively within the four corners of the affidavit, which made an evidentiary hearing unnecessary. An evidentiary hearing serves to develop a factual record through testimony, credibility determinations, or evidence extrinsic to an existing document. But where, as here, the determinative inquiry is confined by law to the contents of a single written affidavit, a hearing can add nothing to the determination of probable cause: there is no testimony to weigh, no credibility to assess, and no fact to develop beyond what is already on the face of that document. Because Agent Manoogian's testimony at that hearing has no bearing on the legal question, Magistrate Judge Kimmins was not required to personally observe his live testimony, and could not properly consider his testimony in any light, let alone a light "most favorable to

the position of the government."[1]

On de novo review, the Court undertakes the four-corners inquiry independently, examining the affidavit to determine whether it establishes probable cause. *See Anderson*, 453 F.2d at 175 ("[A]ll data necessary to show probable cause for the issuance of a search warrant must be contained within the four corners of a written affidavit given under oath."); *see also Ewing v. City of Stockton*, 588 F.3d 1218, 1225 n.8 (9th Cir. 2009) (declining to consider evidence outside the affidavit when determining whether a search warrant was supported by probable cause). Consistent with that rule, the Court does not consider the testimony presented at the evidentiary hearing and now turns to the affidavit in support of the warrant application and its contents.

B. <u>The affidavit established probable cause to search the vehicle.</u>

Agent Manoogian's affidavit established "a fair probability" that a firearm would be found in the white BMW in early June 2023. *Steinman*, 159 F.4th at 568 (quoting *Rodgers*, 656 F.3d at 1028). Specifically, the affidavit included the following information that, under the totality of the circumstances, fairly linked the firearm to the vehicle: (1) Pierson admitted to Agents that she purchased firearms for "Roy"/"Memphis," and stated that he took possession of the firearms and placed them in his car, (Manoogian Aff. ¶¶ 26–27); (2) the owner of John's Guns & Ammo confirmed that a man aligning with Pierson's description of Memphis paid for a firearm Pierson was purchasing and provided a photo from the store's surveillance footage showing that man and his white BMW sedan at the store on the date of one of Pierson's firearm purchases, (*id.* ¶¶ 28, 31); (3) the users of Cherry and Pierson's phone numbers exchanged a series of text messages on and around

[1] The R&R erroneously stated that "[e]vidence presented at a suppression hearing is viewed in the light most favorable to the government." (Doc. 72 at 3 n.2 (citing *United States v. Sherman*, 430 F.2d 1402, 1404 (9th Cir. 1970)). Evidence presented at a suppression hearing is not by default viewed by the trial court in the light most favorable to the government. Rather, "*[w]hen a motion to suppress has been denied* [the court of appeals] view[s] the evidence in the light most favorable to the government." *United States v. Rothman*, 492 F.2d 1260, 1262–63 (9th Cir. 1973) (emphasis added) (citing *Sherman*, 430 F.2d at 1404). Nonetheless, it does not appear that Magistrate Judge Kimmins applied this incorrect standard. The R&R's Discussion section continually cites to Agent Manoogian's affidavit and explicitly states that the "information *contained in Agent Manoogian's affidavit is sufficient* to establish a fair probability that contraband would be found in the BMW at the time the warrant was issued." (Doc. 72 at 6 (emphasis added).)

the date of that firearm purchase, (*id.* ¶¶ 33–38); (4) details Pierson provided of Memphis align with identifying features of Cherry, such as his Tennessee area code, physical appearance, and where he lived in Tucson, (*id.* ¶¶ 27, 38, 43); (5) a relative of Cherry had a white BMW sedan registered in Arizona, which had similar features to the BMW shown in the FFL's surveillance footage, (*id.* ¶¶ 40–41, 47); (6) that same relative of Cherry had active utility service at one of Cherry's current addresses, (*id.* ¶¶ 38–40); and (7) Cherry is a convicted felon, thereby prohibited from possessing firearms, (*id.* ¶ 44).

Further, the affidavit stated, based upon Agent Manoogian's "personal observations, training, experience," including his sixteen years with ATF, "and information obtained from other Special Agents and sources," (*id.* ¶¶ 1, 4), prohibited possessors "tend to retain their firearms for long periods of time, since they cannot easily acquire firearms from federally licenses [*sic*] dealers, where a criminal background check is required to obtain a firearm" (*id.* ¶ 9), and "sometimes keep their firearms inside vehicles registered to other individuals to deny ownership and possession of the firearms if they are stopped by law enforcement," (*id.* ¶ 12). Taken together, the information in the affidavit establishes probable cause.

C. <u>The information supporting probable cause was not stale.</u>

Data supporting a finding of probable cause is timely when "there is sufficient basis to believe, based on a continuing pattern or other good reasons, that the items to be seized are still on the premises." *United States v. Gann*, 732 F.2d 714, 722 (9th Cir. 1984). The "mere passage 'of substantial amounts of time is not controlling in a question of staleness.'" *United States v. Flores*, 802 F.3d 1028, 1043 (9th Cir. 2015) (quoting *United States v. Dozier*, 844 F.2d 701, 707 (9th Cir. 1988)). "Staleness must be evaluated in light of the particular facts of the case and the nature of the criminal activity and property sought." *United States v. Greany*, 929 F.2d 523, 525 (9th Cir. 1991).

In his Motion, Cherry argues that the information supporting probable cause was stale—and therefore the search warrant was invalid—because: (1) the information was obtained approximately two-and-a-half months before the Government applied for a search

warrant; (2) the Government failed to establish “a pattern of similar conduct” by Cherry; and (3) the evidence was easily disposable. (Doc. 53 at 4–9.) The Court disagrees.

First, the information supporting the search warrant affidavit was not stale due to the passage of time. The passage of time is not dispositive on the issue of staleness, and “other good reasons” may support a timely finding of probable cause. *Gann*, 732 F.2d at 722. Here, Agent Manoogian’s affidavit provided other good reasons why the items to be seized would still be on the premises in June 2023, specifically that prohibited possessors “tend to retain their firearms for long periods of time since they cannot easily acquire firearms from federally licenses [*sic*] dealers,” (Manoogian Aff. ¶ 9), and that prohibited possessors “sometimes keep their firearms inside vehicles registered to other individuals to deny ownership and possession of the firearms if they are stopped by law enforcement,” (*id.* ¶ 12). Further, Agent Manoogian indicated in his affidavit that Cherry was believed to have driven the white BMW registered to his relative Tara Cherry. (*Id.* ¶¶ 31, 40–41, 47.) Under the totality of the circumstances, these points, along with the other information contained in the search warrant, created a fair probability that a firearm would be found in the vehicle in June 2023.

Second, the Government was not required to establish “a pattern of similar conduct.” Information supporting a search warrant may be timely even if it is not based on “a pattern of similar conduct.” While a continuing pattern of conduct may support a conclusion of timeliness, “other good reasons” to believe the items to be seized are still on the premises—such as Agent Manoogian’s testimony described above—are sufficient to support such a conclusion. *Gann*, 732 F.2d at 722.

Third, *United States v. Grant*, 682 F.3d 827 (9th Cir. 2012), the case Cherry relies upon to argue that a firearm is easily disposable, and so the search warrant affidavit did not sufficiently establish probable cause, is distinguishable. (Doc. 53 at 8–9.) *Grant* specifically concerned a murder weapon, which the defendant had a “strong incentive” to dispose. The firearm here is not of that character. 682 F.3d at 835. Agent Manoogian’s affidavit contains information from which a reasonable inference may be drawn that the

opposite incentive exists with regard to the firearm in this case, in that prohibited possessors "tend to retain their firearms for long periods of time, since they cannot easily acquire firearms from federally licenses [*sic*] dealers." (Manoogian Aff. ¶ 9.)

D. <u>Even if the warrant was invalid due to staleness, the good faith exception to the exclusionary rule applies.</u>

"[T]he marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." *United States v. Leon*, 468 U.S. 897, 922 (1984). Therefore, the good faith exception to the exclusionary rule applies when the search warrant affidavit "establish[ed] at least a colorable argument for probable cause" and officers "relied on the search warrant in an objectively reasonable manner." *Crews*, 502 F.3d at 1136 (quoting *United States v. Luong*, 470 F.3d 898, 903 (9th Cir. 2006)).[2] A colorable argument for probable cause is established when it is "reasonable to seek the evidence at the location indicated in the affidavit." *Id.* at 1137.

Agent Manoogian's affidavit provided a colorable argument for probable cause, *see supra* Section III.B., and officers therefore reasonably relied on the search warrant in searching the BMW. Thus, even if the search warrant was not in fact supported by probable cause, the evidence obtained from the search should not be suppressed because the good faith exception to the exclusionary rule applies.

Accordingly,

//

//

//

//

//

//

//

---

[2] Although Cherry argues that "*Crews* is inapposite," there is no error in citing *Crews* for its principle. (Doc. 76 at 12.)

**IT IS HEREBY ORDERED:**

1. Magistrate Judge Lynnette C. Kimmins's Report and Recommendation (Doc. 72) is **accepted** and her recommendation to deny the Motion to Suppress is **adopted**.

2. Cherry's objections to the R&R are **overruled**, and Cherry's Request for a De Novo Evidentiary Hearing (Doc. 76) is **denied**.

3. Cherry's Motion to Suppress Evidence (Doc. 53) is **denied**.

Dated this 11th day of August, 2026.

Jennifer G. Zipps
Chief United States District Judge